UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALFREDO VASQUEZ-HERNANDEZ,          )
                                    )
            Petitioner,             )
                                    )        No. 18 C 2620
       v.                           )
                                    )        Chief Judge Rubén Castillo
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )

## MEMORANDUM OPINION AND ORDER

Alfredo Vasquez-Hernandez ("Petitioner") is serving a 22-year sentence for his

participation in a drug conspiracy. He filed a petition to vacate his sentence under 28 U.S.C.

§ 2255 ("the Petition"). (R. 1, Pet.) For the reasons set forth below, the Petition is denied.

## BACKGROUND

On January 5, 2012, Petitioner was charged in a third superseding indictment with

distributing controlled substances in violation of 21 U.S.C. § 846 (Count One), and conspiracy to

import controlled substances into the United States in violation of 21 U.S.C. § 963 (Count Two).

*United States v. Vasquez-Hernandez*, No. 09 CR 383-5 (N.D. Ill. filed Aug. 5, 2009), R. 157,

Indictment. Petitioner was alleged to be a logistical coordinator for the Sinaloa Cartel,

responsible for importing multi-ton quantities of cocaine to Mexico from Central and South

American countries, delivering multi-kilogram quantities of cocaine into the United States, and

coordinating deliveries of bulk quantities of U.S. currency to Mexico from narcotics customers

in the United States. *Id.* at 6-7.

On April 29, 2014, Petitioner entered a "blind" guilty plea[1] to Count One pursuant to a written plea declaration. *Id.*, R. 315, Plea Decl.; *id.*, R. 391, Plea Hr'g Tr. at 1-29. Attorneys Paul Brayman, Lisa Wood and Arturo Hernandez represented Petitioner at the change-of-plea hearing. *Id.*, R. 391, Plea Hr'g Tr. at 1-2. At the beginning of the hearing, this Court warned Petitioner as follows: "I need to warn you that any false answers to any of my questions could subject you to additional charges for what are known as the crimes of perjury or false statement and could needlessly aggravate your sentence, so that is not something I would suggest that you do." *Id.* at 4-5. Petitioner, speaking through a Spanish interpreter, testified that he understood the Court's warning. *Id.* at 3, 5. The Court then had Petitioner placed under oath. *Id.* at 5. Upon questioning by the Court, Petitioner testified that he was in good physical health other than suffering from high blood pressure, that he had not had any alcoholic beverages within the last 24 hours, and that he had never been under the care of a doctor for the treatment of a mental condition. *Id.* at 5-6. He further testified that he had had enough time to talk to his attorneys, that he had told them everything he knew about this case, and that he was satisfied with their representation. *Id.* at 7.

As to the potential penalties Petitioner was facing, Petitioner testified that he understood that the charged offense carried a maximum sentence of life imprisonment, a statutory mandatory minimum sentence of ten years, and that he was not eligible for probation. *Id.* at 8-9. He testified that he understood that any disputes between the parties regarding the application of the U.S. Sentencing Guidelines would be resolved by the Court. *Id.* at 9. The Court specifically warned him that there were "likely to be disputes" about the appropriate sentence in this case, since the government believed that the applicable sentencing guideline range was 324 to 405 months, whereas Petitioner's attorneys believed that the applicable guideline range was 168 to 210

---

[1] A "blind" plea means, in effect, that "there was no agreement with the government." *United States v. Nunez*, 958 F.2d 196, 200 (7th Cir. 1992).

months—a substantial disparity. *Id.* at 9-10. The Court again advised Petitioner that his sentence could be as low as 10 years' imprisonment or as high as life in prison. *Id.* at 10. The Court then asked Petitioner, "Do you understand that?" and he responded, "Yes." *Id.* at 11.

The Court asked Petitioner whether "anyone promised you any type of specific sentence in order to plead guilty?" *Id.* at 11. He responded, "No." *Id.* The Court then explained:

> I need to tell you . . . in order for . . . [a pre-plea sentencing promise] to be a binding promise, it would have to be reduced to writing, and it would have to be something where the government is agreeing to it subject to court approval, but you do not have any type of agreement with the government . . . you do not have an agreement to cooperate, and you also do not have an agreement as to . . . a specific sentence.

*Id.* at 11. Petitioner testified that he understood these concepts and that he did not have any agreement to cooperate or any agreement with the government as to a specific sentence. *Id.* For further clarity, the Court asked him, "So you have no agreement with the government. Is that correct?" *Id.* at 12. He responded, "Correct." *Id.*

The Court also specifically questioned Petitioner about any sentencing predictions that may have been made to him by his attorneys or anyone else. *Id.* The Court stated:

> [Y]ou need to know that those predictions cannot be accurate because, as I sit here today as the person that's ultimately going to be responsible for sentencing you, I don't know enough about you or about all of the facts of this case to have a firm decision as to what your sentence will be, and I want you to understand that. Do you understand that?

*Id.* Petitioner responded, "Yes, yes." *Id.* The Court further explained that it would not "make up [its] mind" about the proper sentence until it had reviewed the presentence report, which was yet to be prepared by the U.S. Probation Department. *Id.* Petitioner again testified that he understood this concept. *Id.* The Court cautioned Petitioner that "you need to know even though you're pleading guilty to Count 1, the government will argue at sentencing that I'm entitled to consider all of the facts related to this case that are seen as relevant to this case. Do you understand that?"

*Id.* He again responded, "Yes." *Id.* at 13. The Court then asked, "Do you . . . have any questions about the potential penalties that you are facing?" *Id.* Petitioner replied, "No." *Id.*

Related to the immigration consequences of his plea, the Court cautioned him as follows: "[Y]ou should know that as a result of pleading guilty, one of the likely outcomes is that you will be deported back to your native country . . . do you understand that?" *Id.* He replied, "Yes." *Id.* The Court then asked, "Do you have any questions about that?" *Id.* He responded, "No, none." *Id.* Attorney Hernandez then stated that he had previously explained to Petitioner that as a legal resident, he may have some "potential deportation resources available to him." *Id.* at 14. The Court stated that "you might be able to resist any effort at deportation; but what you need to know and what I need to tell you is that the government is likely to seek your deportation." *Id.* at 14. Petitioner testified that he understood. *Id.* Upon further questioning, Petitioner testified that no one had forced him, directed him, or threatened him to plead guilty, and that his decision to plead guilty was entirely voluntary. *Id.* at 17-18.

The Court then showed Petitioner his 12-page plea declaration. *Id.* at 18. The Court questioned him in detail about the declaration, and in response he agreed that it was his signature on the document and testified that he had fully reviewed it with his attorneys before signing it. *Id.* Attorney Hernandez then stated for the record that Petitioner had reviewed the plea declaration with the assistance of a "certified court interpreter from the district," along with his three attorneys, including Attorney Hernandez who himself spoke fluent Spanish (and had in fact previously worked as a certified court interpreter in California). *Id.* at 18-19.

In the plea declaration, Petitioner attested that he was pleading guilty "because he is in fact guilty of the charge contained in Count One of the indictment." *Id.*, R. 315, Plea Decl. at 2. He admitted to the following facts:

> [O]n or about November 3, 2008, he arranged to transport approximately 200 kilograms of cocaine belonging to [co-defendants] Pedro and Margarito Flores from Los Angeles to the Northern District of Illinois. [Petitioner] further admits that in approximately October or November 2008, Individual A "fronted" him 76 kilograms of cocaine, which he asked Pedro and Margarito to sell for him on consignment in Chicago. [Petitioner] further admits that he and Pedro and Margarito Flores negotiated a price of $28,500 per kilogram for the 76 additional kilos (totaling $2,133,000) for which [Petitioner] expected payment once the 76 kilos were sold by the Flores brothers in Chicago. [Petitioner] further admits that he arranged to transport the 76 kilograms of cocaine to the Northern District of Illinois together with the 200 kilograms of cocaine, for which he never received payment from the Flores brothers.

*Id.* at 2-3.

The plea declaration also discussed sentencing in detail. It specified that Petitioner understood he was facing a maximum sentence of life in prison; that the U.S. Sentencing Guidelines are advisory, not mandatory, and that the Court would make the final Guidelines calculation as well as determine the ultimate sentence that would be imposed; and that, if the government's arguments were accepted, the applicable Guidelines range would be 324-405 months. *Id.* at 3-4, 7. As to the immigration consequences of his guilty plea, the plea declaration specified that Petitioner recognized that his guilty plea "may have consequences with respect to his immigration status," and that "a broad range of crimes are removal offenses." *Id.* at 10. The declaration specified that Petitioner understood that "no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status." *Id.* Petitioner affirmed in the plea declaration that he wanted to plead guilty "regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States." *Id.* Petitioner also acknowledged that he had read the plea declaration "with the help of a certified Spanish Interpreter and carefully reviewed each provision." *Id.* at 12. Finally, he acknowledged that "there were no threats, promises, predictions, or representations

made, nor agreements reached, to induce him to plead guilty other than what has been stated in this document." *Id.*

After reviewing the plea declaration in detail, the Court turned to the government to provide a factual basis for the plea. *Id.*, R. 391, Plea Hr'g Tr. at 19. The government then summarized the evidence it had against Petitioner. *Id.* at 20-22. The government stated that if the case were to proceed to trial, it would call as witnesses various government agents and cooperating witnesses; would introduce seized narcotics and U.S. currency; would present recorded conversations between Petitioner and his co-conspirators that would establish that between May 2005 and December 2008, Petitioner conspired with Pedro and Margarito Flores and others to distribute more than 5 kilograms of cocaine in this District. *Id.* at 20. Consistent with the admissions in Petitioner's plea declaration, the government asserted that the evidence would show as follows:

> [O]n or about November 3, 2008, [Petitioner] arranged to transport approximately 200 kilograms of cocaine belonging to co-defendants Pedro and Margarito Flores by train from Los Angeles to the Northern District of Illinois. [Petitioner] admits that in approximately October or November of 2008 an individual identified in the plea declaration as Individual A fronted him an additional 76 kilograms of cocaine which he asked Pedro and Margarito Flores to sell for him on consignment in Chicago. [Petitioner] admits in his plea declaration and the evidence would show that he and Pedro and Margarito Flores negotiated a price of $28,500 per kilogram for that additional 76 kilograms of cocaine, totaling $2,133,000 for which [Petitioner] expected payment once the 76 kilograms were sold by the Flores brothers in Chicago. The evidence would further show that [Petitioner] arranged to transport those 76 kilos of cocaine to the Northern District of Illinois together with that additional 200 kilograms of cocaine, totaling 276 kilograms of cocaine, and [Petitioner] indicates that he never received payment from the Flores brothers for that 76 kilos of cocaine.

*Id.* at 20-21. The Court then asked Petitioner, "[D]o you agree that you were involved in the shipment of more than 70 kilograms of cocaine with the two Flores brothers, Pedro and Margarito?" *Id.* at 21. Petitioner replied, "Yes." *Id.* Petitioner then entered a formal plea of guilty

to Count One of the indictment. *Id.* at 22. The Court accepted the plea, finding as follows: "[Y]ou have freely waived your trial rights, you've had the assistance of three separate able and experienced counsel, you know what the maximum possible punishment is . . . [and] you are knowingly, intelligently, and voluntarily pleading guilty to Count 1[.]" *Id.* The Court then set the case for sentencing. *Id.*

Prior to sentencing, a presentence investigation report ("PSR") was prepared by the U.S. Probation Department. *Id.*, R. 335, PSR at 8, 10. Petitioner's base offense level was determined to be 38 as a result of his admission that he transported at least 276 kilograms of cocaine, though the probation officer noted the government's contention that Petitioner was responsible for approximately 20,700 additional kilograms of cocaine. *Id.* at 8. The base offense level was increased by an additional two levels for the use of a firearm, two more levels for the use of an aircraft, three more levels for Petitioner's supervisory role in the offense, and was reduced by three levels for acceptance of responsibility based on his guilty plea. *Id.* at 8-10.

In response to the PSR, Petitioner's attorneys filed Petitioner's version of the offense, wherein Petitioner admitted that he was responsible for 276 kilograms of cocaine but argued that the sentencing enhancements sought by the government should not apply. *Id.*, Attachment 2 at 25-35. Petitioner's attorneys argued that Petitioner should receive an additional two-level reduction based on proposed sentencing changes expected to be adopted as part of the 2014 Sentencing Guidelines. *Id.* at 25.

Petitioners' attorneys separately filed a sentencing memorandum and objections to the PSR, arguing that Petitioner should not be held responsible for the additional 20,000 kilograms of cocaine, for using an aircraft or firearms during the offense, or for having a supervisory role in the drug conspiracy. *Id.*, R. 344, Sentencing Mem. at 4. They argued that the government's

primary evidence in support of these enhancements—a November 2008 undercover conversation surreptitiously recorded by Pedro Flores—was of such poor quality as to be unreliable and that the statements made by Petitioner on the recording were too equivocal to be evidence of his participation in a drug conspiracy. *Id.* In their view, the conversation was also "consistent with talk of a legitimate business venture." *Id.* at 5. Petitioner's attorneys further argued that the Flores brothers "cannot be believed," noting that they had lied to government agents numerous times during the course of their cooperation. *Id.*

On November 24, 2014, Petitioner was sentenced. *Id.*, R. 364, Sentencing Tr. at 1-29. Petitioner's counsel again attacked the Flores brothers' credibility, arguing, "[Y]ou can't believe a word the Flores brothers say." *Id.* at 8. The Court described counsel's arguments as "an all-out credibility attack on the Flores brothers." *Id.* at 6. The Court ultimately sustained the defense objection to the drug quantity determination based on "credibility issues with the Flores brothers who have motive to shift responsibility away from themselves." *Id.* at 11. The Court only held Petitioner responsible for the 276 kilograms of cocaine that he had admitted to transporting. *Id.* The Court also sustained the defense objection to the enhancement for possession of a firearm. *Id.* The Court imposed a three-level enhancement for Petitioner's supervisory role in the offense, based on the Court's conclusion that "it is nonsensical to think that two people [Petitioner and Individual A] could bring 276 kilograms of cocaine from the country of Mexico all the way to Chicago." *Id.* at 13. Based on the 2014 version of the Guidelines (which Petitioner had requested that the Court use), the Court calculated an offense level of 36 and a criminal history category of I, yielding an advisory Guidelines range of 188-235 months. *Id.* at 15-16. After hearing arguments from counsel about the sentencing factors contained in 18 U.S.C. § 3553, the Court imposed a sentence of 22 years. *Id.* at 25-26.

Petitioner appealed, raising a number of challenges to his sentence. *United States v. Vasquez-Hernandez*, 834 F.3d 852 (7th Cir. 2016). His principal argument was that the Court erred in imposing a three-level supervisory-role enhancement. *Id.* at 853. In his view, there was insufficient evidence that he supervised any other individuals to support this enhancement. *Id.* The U.S. Court of Appeals for the Seventh Circuit disagreed, finding ample evidence to support the Court's conclusion that Petitioner had authority over at least one other person within the drug conspiracy. *Id.* at 853-54. Petitioner further argued that this Court erred in imposing an above-Guidelines sentence, but again the Seventh Circuit disagreed. *Id.* at 854-55. The Seventh Circuit affirmed his sentence in all respects. *Id.* at 855. Petitioner filed a petition for writ of certiorari with the U.S. Supreme Court, which was denied on April 17, 2017. *Vasquez-Hernandez v. United States*, 137 S. Ct. 1600 (2017).

On April 12, 2018, Petitioner filed the present Petition. (R. 1, Pet.) He claims that Attorneys Hernandez, Brayman, and Wood were ineffective for "blatantly misrepresenting his sentence exposure under the blind plea," and "purposefully mischaracteriz[ing]" the strength of the government's case.[2] (*Id.* at 25, 30.) In connection with the first ground, he claims that his attorneys applied "overbearing pressure" to get him to plead guilty, failed to translate the plea declaration into Spanish so that he could understand it, and told him that they had a secret "deal" with the prosecution, wherein he would receive a sentence of no more than 14 years in prison. (*Id.* at 19-21.) As to the second ground, he claims that his attorneys significantly miscalculated the strength of the government's evidence against him in advising him to plead guilty and failed to recognize the problems with the Flores brothers' credibility. (*Id.* at 30-36.)

---

[2] Petitioner has a new attorney, Martin Molina, representing him in this proceeding. (*See* R. 1, Pet. at 2.)

In response, the government argues that Petitioner's claims lack merit. (R. 9, Gov't's Resp. at 12-29.) The government argues that Petitioner cannot overcome the many statements he made under oath during the plea colloquy and in the plea declaration that he understood his sentencing exposure, that he was pleading guilty entirely voluntarily, and that no one had promised him anything, threatened him, or otherwise induced him to plead guilty. (*Id.* at 16-23.) The government additionally argues that his attorneys made a reasonable strategic decision in advising him to be plead guilty given the options he was facing. (*Id.* at 23-29.) Petitioner filed a reply responding to the government's arguments. (R. 15, Reply.) The matter is now fully briefed.

## LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner can seek to vacate his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

## ANALYSIS

Under the Sixth Amendment, a criminal defendant is entitled to "'effective assistance of counsel'—that is, representation that does not fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms.'" *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009) (per curiam) (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 688 (1984)). To

prevail on such a claim, the petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687.

On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). In other words, counsel "need not be perfect, indeed not even very good, to be constitutionally adequate." *McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (citation omitted); *see also Harrington*, 562 U.S. at 110 ("[T]here is no expectation that competent counsel will be a flawless strategist or tactician[.]"). In evaluating counsel's performance, the Court must avoid employing the benefit of hindsight, and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). Additionally, the Court must "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight[.]" *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). As the Seventh Circuit has instructed: "[I]t is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) (citation omitted).

On the prejudice prong, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it

is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. at 112.

The Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Such claims are governed by the same "two-part test set forth in *Strickland*." *Missouri v. Frye*, 566 U.S. 134, 140 (2012). On the performance prong, a petitioner must show that counsel's representation in connection with the plea process "fell below an objective standard of reasonableness." *Lafler*, 566 U.S. at 163 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). In this context, the Court must take particular care to avoid the "distortions and imbalance that can inhere in a hindsight perspective[.]" *Premo*, 562 U.S. at 125. The Court must bear in mind that "the sentencing consequences of guilty pleas . . . are extraordinarily difficult to predict." *United States v. Barnes*, 83 F.3d 934, 940 (7th Cir. 1996); *see also Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006) ("Because many questions about the facts and how a court or jury will apply the law to those facts cannot be answered by counsel with certitude, waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts." (citation and internal quotation marks omitted)). Thus, "[a]n attorney must render advice in a good-faith effort to further his client's interests, but the Constitution does not guarantee that the advice will be correct." *United States v. Rice*, 116 F.3d 267, 269 (7th Cir. 1997).

To establish prejudice in the plea bargain context, a petitioner must show that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. It is not enough to show that counsel gave the petitioner inaccurate advice; counsel's

advice must have been the "decisive factor" in the petitioner's decision to accept or reject the plea. *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009). A defendant's "self-serving" testimony that he would have made a different decision with accurate advice need not be accepted at face value by the Court. *Foster v. United States*, 735 F.3d 561, 566-67 (7th Cir. 2013); *see also Bethel*, 458 F.3d at 718 (observing that "[w]e have stated many times that a mere allegation by the defendant" that he would have proceeded differently with accurate advice "is not sufficient to establish prejudice").

## I.    Undue Pressure and Inaccurate Advice About Plea

Petitioner's first claim is that his attorneys asserted "overbearing pressure" on him to plead guilty, misadvised him about his sentencing exposure and the immigration consequences his plea, and told him that they had a side deal with the government, under which he would receive no more than 14 years' imprisonment. (R. 1, Pet. at 1-34.) The Court finds this claim to be foreclosed by the numerous statements Petitioner made under oath during the plea colloquy.

"[R]epresentations made to a court during a plea colloquy are presumed to be true." *Hurlow v. United States*, 726 F.3d 958, 968 (7th Cir. 2013) (internal quotations and citations omitted). Thus, "a defendant who states at a Rule 11 plea colloquy that his plea was freely and knowingly given. . . faces an uphill battle in convincing a judge" that his plea was not voluntary. *United States v. Patterson*, 576 F.3d 431, 437 (7th Cir. 2009) (citation and internal quotation marks omitted). This presumption applies because the "purpose of a Rule 11 colloquy is to expose coercion or mistake, and the district judge must be able to rely on the defendant's sworn testimony at that hearing." *Hutchings v. United States*, 618 F.3d 693, 699 (7th Cir. 2010) (citation omitted). Thus, a "defendant is normally bound by the representations he makes to a court during the colloquy." *Id.* "[A] motion that can succeed only if the defendant committed

perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005).

Petitioner has not offered any such compelling explanation or otherwise overcome the presumption that his guilty plea was knowing and voluntary. This Court thoroughly exhausted the topic of whether Petitioner had been offered any promises outside the plea, and he is bound by his repeated assurances that he had not. *See Hutchings*, 618 F.3d at 699 ("Justice would be ill-served, and the utility of the Rule 11 colloquy would be undermined, by allowing [the petitioner] to renege on his representations under oath to the district court that there were no promises made to him to induce his guilty plea."). The many statements he made under oath during the plea colloquy make clear that he knew that he faced a maximum sentence of life imprisonment and a statutory mandatory minimum sentence of ten years' imprisonment; that any dispute between the parties regarding the application of the Sentencing Guidelines would be resolved by this Court; that the government planned to argue that the applicable guideline range was between 324 to 405 months; that any sentencing promises made to him had to be reduced to writing and were subject to the Court's approval; that any predictions by any one of his attorneys could not be accurate because it is the Court who would decide his sentence; that he could be sentenced on additional relevant conduct beyond what he admitted in his plea declaration and colloquy; and that the government was likely to seek his deportation at the conclusion of his sentence. *Vasquez-Hernandez*, 09 CR 383-5, R. 391, Plea Hr'g Tr. at 5-18. He twice denied that anyone had made

him a promise regarding his sentence in order to induce him to plead guilty.[3] *Id.* at 11, 12. He expressly testified that no one had forced him, directed him, or threatened him to plead guilty, and that his decision to plead guilty was entirely his own. *Id.* at 17-18.

Additionally, in the plea declaration that he admitted signing, he acknowledged that he had an adequate opportunity to fully review the document with a Spanish interpreter, that he knew he was facing a potential life sentence, and that no one had made him any promises regarding his sentence. *Id.*, R. 315, Plea Decl. at 2-3, 12. Attorney Hernandez likewise stated on the record during the plea colloquy that Petitioner's attorneys had fully reviewed the plea declaration with him with the assistance of a certified Spanish interpreter. *Id.*, R. 391, Plea Hr'g Tr. at 5-18. Petitioner was standing right next to Attorney Hernandez when he made this statement and at no time did he object or otherwise alert the Court to any concern he had about not having the plea declaration adequately explained to him in his native language. *See id.*

Additionally, even if Petitioner's attorneys somehow misadvised him, this Court "cured" any alleged deficiencies in his attorneys' advice at the plea colloquy by fulling explaining, through a certified Spanish interpreter, Petitioner's sentencing exposure and the immigration

---

[3] Petitioner claims that he was told by Attorney Hernandez that he "did not have to worry" about his sentence because Attorney Brayman is a "drinking friend" of this Court. (R. 2, Mem. at 20; *see also* R. 2-1, Pet'r's Aff. ¶¶ 11-12.) Even if Attorney Hernandez made this statement, there is no truth to it. Attorney Brayman has appeared before this Court many times over the course of the last two decades and is a respected member of the criminal defense bar in Chicago, but this Court does not "drink" with him or otherwise have any personal relationship with him.

consequences of his plea.[4] *See Flores v. United States*, 653 F. App'x 472, 475 (7th Cir. 2016)

(concluding that the court had "cured any deficiency in the advice [the petitioner] was given" by

his attorney, where the court "through a Spanish interpreter—explained the nature of the charges,

told [petitioner] the consequences of pleading guilty (including the waivers of his rights to appeal

and to collaterally attack his sentence), explained the statutory minimum sentences, advised him

that he likely would be deported based on the convictions, and determined that a factual basis for

the plea existed"). Petitioner asserts that if his attorneys had informed him "that the prosecutor

was going to ask for a sentence of 324 to 405 months and that I was exposed to that sentence, I

never would have signed the guilty plea document." (R. 2-1, Pet'r's Aff. ¶ 18.) But this Court

advised him of exactly that at the plea hearing. *Vasquez-Hernandez*, 09 CR 393-5, R. 391, Plea

Hr'g Tr. at 9-10. He testified under oath that he understood this and nevertheless wished to plead

guilty. *Id.* at 11. He cannot simply walk away from his sworn testimony. *Hutchings*, 618 F.3d at

699.

In short, the record thoroughly refutes Petitioner's claim that he was unwilling to enter a

guilty plea or lacked sufficient knowledge of what he was agreeing to in connection with his

guilty plea. Under these circumstances, Petitioner's claim fails. *See Hutchings*, 618 F.3d at 699

(concluding that Section 2255 petitioner's explanation that he lied during the plea colloquy

because he had a "secret" deal with the government regarding his sentence was "wholly

---

[4] In addition to his own declaration, Petitioner also submits a declaration from Miguel Gutierrez, an attorney licensed in Mexico who was "retained by the family of [Petitioner] . . . to act as a facilitator between [Petitioner] and his attorneys." (R. 2-4, Gutierrez Decl. ¶ 2.) It is unclear precisely what role Gutierrez played in the criminal case, as he never filed an appearance or sought leave to appear *pro hac vice*. He claims to have been present at court proceedings and during Petitioner's private meetings with his attorneys, and he echoes Petitioner's account that Petitioner's attorneys told him "that they had a deal with the prosecutor . . . where he faced a maximum sentence of 14 years[.]" (*Id.* ¶ 6.) For the Court to accept Gutierrez's account, it would have to presume that Gutierrez, a licensed attorney, sat by and did nothing while Petitioner knowingly perjured himself before this Court. But even if the Court were to accept Gutierrez's account, this Court fully "cured" any deficiencies in the advice given to Petitioner by his attorneys during the plea colloquy. *See Flores v. United States*, 653 F. App'x 472, 475 (7th Cir. 2016).

insufficient to override the verity that presumptively attaches to a defendant's statements when entering a guilty plea"); *Bethel*, 458 F.3d at 719 (rejecting Section 2255 petitioner's claim that his plea was involuntary where he made "broad and repeated concessions that he understood his sentence could be more severe than predicted and that he was not relying on a particular sentence in signing the plea agreement and pleading guilty"); *United States v. Elezi*, No. 17 C 0162, 2018 WL 5024972, at *5 (N.D. Ill. Oct. 17, 2018) (rejecting Section 2255 petitioner's claim that his plea was invalid because he had been promised a side deal for a more lenient sentence, where the court questioned him at length during the plea colloquy about whether he had received any promises outside the plea agreement, and he responded that he had not); *United States v. Jaimes-Moreno*, No. 13 CR 694, 2017 WL 8209106, at *17 (N.D. Ill. Dec. 11, 2017) ("The defendant had many opportunities before the Court—under oath—to describe any issues relating to competency, coercion, or promises of a lenient sentence, and the defendant repeatedly affirmed that there were none. As such, the law does not allow the defendant to cast those sworn statements aside when the sentence he received was not to his liking.").

The Court is not persuaded by Petitioner's heavy reliance on *Tovar-Mendoza v. Hatch*, 620 F.3d 1261 (10th Cir. 2010). (*See* R. 2, Mem. at 30-32; R. 15, Reply at 7-9.) Aside from the fact that this out-of-Circuit case applies a more lenient rule than the Seventh Circuit to habeas petitioners who contradict their sworn statements made during plea colloquies, the case is distinguishable. In that case a state prisoner challenged his conviction under 28 U.S.C. § 2254, which involves different legal standards than a petition under Section 2255. *See Tovar-Mendoza*, 620 F.3d at 1268-69. Additionally, the petitioner's attorney had a history of misconduct in connection with plea colloquies, and the attorney was alleged to have been directly providing the petitioner the appropriate answers to the court's questions during the plea hearing. *Id.* at 1270-

71. By contrast, there is nothing before the Court to reflect that any of Petitioner's attorneys have a history of misconduct, and two of them are respected members of this Court's trial bar. This Court presided over the plea colloquy and can firmly state that none of Petitioner's attorneys were providing him with the appropriate answers or otherwise speaking to him while this Court questioned him at length about the voluntariness of his plea.

For these reasons, Petitioner has failed to demonstrate an entitlement to relief in connection with his first claim.

## II. Ineffective Assistance in Advising Petitioner to Plead Guilty

In his remaining claim, Petitioner asserts that his attorneys were ineffective in advising him to plead guilty in the first place. (R. 2, Mem. at 34-40.) He argues that the primary evidence against him—the Flores brothers' testimony—was "not as water-tight" as his attorneys told him, and that, under the circumstances, any competent attorney would have advised him to proceed to trial. (*Id.* at 36-37.)

This claim also requires consideration of two elements: deficient performance and prejudice. *Strickland*, 466 U.S. at 684-85. On the performance prong, counsel is presumed to have made reasonable strategic judgments, and "there is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *Valenzuela v. United States*, 261 F.3d 694, 698-99 (7th Cir. 2001); *see also Yu Tian Li v. United States*, 648 F.3d 524, 527-28 (7th Cir. 2011) ("[T]o avoid the pitfalls of review in hindsight, our review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). To establish prejudice, Petitioner must demonstrate a reasonable probability that, with competent counsel, "he would not have pleaded guilty and would have insisted on going to trial." *Wyatt*, 574 F.3d at 458.

Petitioner has not established either element here. The Court fully agrees with Petitioner that the Flores brothers had credibility issues: That is the reason this Court did not rely on their testimony at sentencing to hold Petitioner liable for an additional 20,000 kilograms of cocaine. *Vasquez-Hernandez*, No. 09 CR 383-5, R. 364, Sentencing Tr. at 11. But Petitioner's suggestion that he could have defeated the charges simply by attacking the Flores' brother credibility is, at best, revisionist history. The Flores brothers' testimony was far from the government's only evidence inculpating Petitioner in the drug conspiracy. To the contrary, the government intended to rely on the testimony of numerous other cooperating witnesses, undercover recordings, and other evidence. *See Vasquez-Hernandez*, No. 09 CR 383-5, R. 264, Gov't's Evidentiary Proffer. Prior to trial, the government summarized its evidence as follows:

> [T]he government currently anticipates calling approximately ten cooperating witnesses who were involved in large-scale narcotics trafficking activities with [Petitioner] and/or [his co-defendant] Arevalo Renteria. Each of these witnesses will offer testimony of [Petitioner] and Arevalo Renteria's direct participation in the conspiratorial objectives of the Sinaloa Cartel as charged in the indictment, specifically, the import of multi-ton quantities of cocaine from Central and South American countries, including Colombia and Panama, to the interior of Mexico, and then on to the United States . . . . Several witnesses are expected to testify that [Petitioner] identified himself as a lifelong friend of Chapo Guzman, and that [Petitioner] stated that he oversaw the transportation of cocaine for Chapo Guzman in several different ways. On behalf of Chapo Guzman, [Petitioner] organized the transportation of cocaine from Colombia to Mexico in airplanes; was involved in the transportation of cocaine from Colombia to Mexico in submarines used to evade law enforcement and the military when moving cocaine across the open ocean; and facilitated the transportation of cocaine within Mexico and in the United States in rail cars. Several witnesses are expected to testify to [Petitioner]'s use of a train transport system on behalf of the Sinaloa Cartel to deliver large quantities of cocaine to Chicago. Several witnesses will also testify that [Petitioner] also handled the logistics of transporting large shipments of bulk currency from drug proceeds in both the United States and Mexico . . . . The government will introduce at trial numerous tape-recorded telephone conversations between and among coconspirators that reflect methods of operation of the conspiracy, including prices for cocaine, transportation methods, the progress of shipments, the transportation of shipments, and the identification of co-conspirators. Many of these conversations were recorded by the Flores brothers after they began cooperating with the government, and include

conversations with both defendants [Petitioner] and Arevalo Renteria, as well as numerous narcotics-related conversations with several other co-conspirators[.]

*Id.* at 24, 25, 27.

Petitioner's current claim that the case against him rose and fell with the Flores brothers' credibility is simply not supported by the record. In addition, the record shows that his trial attorneys were well aware of the weaknesses in the Flores brothers' testimony, as they raised the issue with this Court on several occasions. *See id.*, R. 364, Sentencing Tr. at 6, 8; *id.*, R. 344, Sentencing Mem. at 4-5. Indeed, their arguments led this Court to make favorable rulings for the defense at sentencing. *Id.*, R. 364, Sentencing Tr. at 11-12. But in light of the other witnesses and evidence the government intended to present at trial, and the very real possibility that Petitioner would receive a life sentence if he were convicted at trial, the Court cannot conclude that it was unreasonable for Petitioner's attorneys to advise him to plead guilty. As the Seventh Circuit has held: "If we were to hold that urging a client who is facing an overwhelming amount of evidence of guilt against him to consider entering into a plea agreement is coercive, then we would make it impossible for defense attorneys to properly fulfill their professional responsibilities of advising their clients and would serve to encourage wasting court time and government resources on trials wherein the outcome is almost a foregone conclusion." *United States v. Messino*, 55 F.3d 1241, 1252 (7th Cir. 1995).

The Court also must consider Petitioner's attorneys' overall performance during this complex case, because "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111. The record shows that Petitioner had such "active and capable advocacy." *Id.* Attorney Hernandez, who is licensed in California and was granted leave to appear *pro hac vice* in Petitioner's criminal case, filed an appearance shortly after Petitioner's arrest. *Vasquez-Hernandez*, No. 09 CR 383-5,

R. 188, Mot. for Leave. Attorneys Brayman and Wood, who are experienced members of this Court's trial bar, were retained as local counsel shortly thereafter. *Id.*, R. 189, Appearance. These attorneys immediately went to work on Petitioner's behalf, filing two motions for discovery, a motion for disclosure, a motion to sever the trial, and a motion for a bill of particulars. *Id.*, R. 198, Mot. for Disc.; R. 200, Mot. for Disclosure; R. 202, Mot. to Sever; R. 203, Mot. for Disc.; R. 205, Mot. for Bill of Particulars. They combed through "voluminous" discovery materials in order to prepare for trial. *Id.*, R. 218, Gov't's Br. at 7. They filed responses to the government's motions in limine and the government's motion to introduce evidence under Federal Rule of Evidence 404(b). *Id.*, R. 275, Resp. to Mots. in Limine; *id.*, R. 273, Resp. to Mot. for Rule 404(b) Evid. They reviewed the plea declaration with Petitioner before the plea colloquy. *Id.*, R. 391, Plea Hr'g Tr. at 16-19. In connection with sentencing, Petitioner's attorneys filed their own version of the offense to rebut the version offered by the government, and separately filed a detailed sentencing memorandum. *Id.*, R. 335, PSR, Attachment 2; *id.*, R. 344, Sentencing Mem. At the sentencing hearing, Attorney Brayman argued eloquently on Petitioner's behalf, arguing not only the applicable law but attempting to paint Petitioner as a hard-working family man deserving of leniency. *Id.*, R. 391, Sentencing Tr. at 3-29. Certain arguments raised by Petitioner's counsel at sentencing were resolved in Petitioner's favor. *Id.* at 11-12. After the sentence was imposed, Petitioner's attorneys filed a timely notice of appeal on his behalf. *Id.*, R. 360, Notice of Appeal. In short, the record reflects that Petitioner's 22-year sentence was the product of significant effort by his skilled attorneys, and he has not established that they provided constitutionally deficient representation.

Nor has he established prejudice. Upon careful questioning by this Court, Petitioner repeatedly reaffirmed under oath at the plea colloquy that he was pleading guilty because it was

his desire to do so and because he was in fact guilty. *Vasquez-Hernandez*, No. 09 CR 383-5, R. 391, Plea Hr'g Tr. at 16-19. He made the same statements in his plea declaration. *Id.*, R. 315, Plea Decl. at 2-3. The Court also considers that at the time Petitioner made the decision to plead guilty, the government had a significant amount of damaging evidence against him, including the testimony of several cooperating witnesses and recordings wherein Petitioner could be heard discussing the details of large-scale drug transactions. *See id.*, R. 264, Gov't's Evidentiary Proffer. If he proceeded to trial and lost, he was facing a life sentence.

In the face of these substantial risks, Petitioner made a reasonable choice to enter a blind plea in hopes of receiving a more lenient sentence. The record firmly suggests that it was a conscious decision by Petitioner, rather than any missteps by his counsel, that led him to plead guilty. *See Foster v. United States*, 735 F.3d 561, 566-67 (7th Cir. 2013) (rejecting defendant's "self-serving" statement in Section 2255 proceeding he would have proceeded differently at the plea bargain stage if given accurate advice by counsel failed to establish prejudice, where other evidence showed that defendant was unwilling to accept a plea at the time of trial); *Wyatt*, 574 F.3d at 458-59 (concluding that defendant's allegation "that he would have chosen a path other than the conditional plea" did not establish prejudice, where he made repeated statements during the plea colloquy that his decision to plead guilty was not tied to a promise of a particular sentence). This Court has little doubt that, had Petitioner disregarded his attorneys' advice and proceeded to trial, he would be serving a far longer sentence than the 22-year sentence he is

presently serving. Therefore, he has not established an entitlement to relief in connection with his second claim. The Petition is denied.[5]

## III.    Certificate of Appealability

To obtain a certificate of appealability, Petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). Based on the record, including the many statements Petitioner made under oath at the plea hearing, the Court cannot conclude that reasonable jurists would debate the outcome of this Petition or find a reason to encourage Petitioner to proceed further. Therefore, the Court declines to issue him a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Petition (R. 1) is DENIED. Petitioner is DENIED a certificate of appealability.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: November 1, 2018**

_____

[5] Petitioner requests in the alternative that the Court hold an evidentiary hearing before ruling on the Petition. (R. 15, Reply at 9.) A court may deny a Section 2255 petition without an evidentiary hearing if "the files and records of the case conclusively show that the prisoner is entitled to no relief[.]" 28 U.S.C. § 2255(b). That standard is met here. Petitioner's sworn testimony during the plea colloquy and his admissions in the plea declaration, along with the rest of the record, conclusively show that he is not entitled to relief. *See Hutchings v. United States*, 618 F.3d 693, 699-700 (7th Cir. 2010) (affirming district court's decision not to hold an evidentiary hearing before deciding ineffective-assistance-of-counsel claim, where the petitioner's statements during the plea colloquy and other evidence in the record defeated petitioner's claim that counsel misadvised him in connection with his guilty plea).